397 So.2d 944 (1981)
E.C. FOGG, III, Alan S. Fogg, and Elizabeth Lane Fogg, Appellants,
v.
BROWARD COUNTY, a Political Subdivision of the State of Florida, et al., Appellees.
No. 79-205.
District Court of Appeal of Florida, Fourth District.
April 8, 1981.
Rehearing Denied May 27, 1981.
*945 Alan S. Gold, Dexter W. Lehtinen, and Clifford A. Schulman of Greenberg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, P.A., Miami, for appellants.
Gaylord A. Wood, Jr., Fort Lauderdale, for appellee, Markham.
Harry A. Stewart, Gen. Counsel, John Franklin Wade, Asst. Gen. Counsel, and Alexander Cocalis, Deputy Gen. Counsel, Fort Lauderdale for appellee, Broward County.
Jim Smith, Atty. Gen., and William D. Townsend, and E. Wilson Crump, Asst. Attys. Gen., Tallahassee, for appellee, Department of Revenue.
BERANEK, Judge.
This case involves the tax status of approximately 270 acres of land in the Town of Miramar, Broward County, Florida. The basic issue is whether the land in question should be classified as agricultural for ad valorem tax purposes pursuant to Section 193.461, Florida Statutes (1973).
Appellants, E.C. Fogg, III, Alan S. Fogg, and Elizabeth Lane Fogg, appeal from a final judgment entered in favor of appellees, Broward County, the Broward County Property Appraiser, and other public entities. This final judgment denied appellants' requested agricultural classification. We reverse and remand.
Appellants brought two actions for declaratory judgment and injunctive relief seeking to have their property classified and taxed as agricultural land for the years 1974 and 1975. The trial court upheld the denial of the agricultural classification by a detailed order and final judgment filed December 26, 1978 and appellants/landowners appeal urging numerous errors. The appellee, property appraiser, contends the property was not used for bona fide agricultural purposes, but was instead being held for and used in the active process of development as a high density residential community and that the property is thus appropriately taxed at its fair market value rather than at the lower agricultural assessment.
The facts surrounding the property are disputed. Depending upon interpretation and resolution of conflicts, the property may be viewed as a family farm or in the *946 alternative as a development tract for single family residences to be built. Appellants assert the property was purchased in 1943 for $75,000. There were initially 500 acres purchased which were in turn divided into three parcels; "Pembroke" (180 acres), "Fogg" (270 acres), and the third "Contiguous" parcel (31 acres). Prior to 1974, all three parcels were classified as agricultural land and taxed as such. On January 1, 1974, the Tax Assessor reassessed the property, continuing to classify "Pembroke" and "Contiguous" as agricultural but reclassifying the "Fogg" parcel as nonagricultural.
As indicated, conflict exists in the possible interpretation of the evidence. The appellees contend the property was actually acquired in a corporate dissolution occurring in 1971, whereby appellants became responsible for $580,000 in mortgage indebtedness against the property. Appellees contend that appellants made the decision to sell the property in 1972, and since that time have engaged in only incidental agricultural use while in the process of selling the property and fully cooperating in its development. These activities included contracts for sale, applications of rezoning, hearings before the City Council, an application for approval of the University Park project to the South Florida Regional Planning Council, engineering studies, approvals of solid waste plans and the approval of bonds to be issued for improvements by the Hollywood Reclamation District. The appellee, property appraiser, argues the property is more aptly described as the "College Park Planned Unit Development" rather than the "Family Farm."
In any event, agricultural pursuits were clearly being carried out on the property at all times in question. Cattle were being grazed by a tenant of the owner under a lease which required the tenant to keep livestock on the property. The lease was cancelable on 90 days' notice from the owner. In addition, private owner horses were boarded by the owner plaintiffs on approximately 100 acres which was not leased. Simply put, the property was being used agriculturally while the paper, permit and financial work was being done to turn it into a planned unit development.
The trial involved the application of Section 193.461(3)(b), (4)(a)(3) and (4)(c). These statutes provide in relevant part as follows:
193.461 Agricultural lands; classification and assessment. 
* * * * * *
(3)(b) Subject to the restrictions set out in this section, only lands which are used primarily for bona fide agricultural purposes shall be classified agricultural. "Bona fide agricultural purposes" means good faith commercial agricultural use of the land. In determining whether the use of the land for agricultural purposes is bona fide, the following factors may be taken into consideration.
1. The length of time the land has been so utilized;
2. Whether the use has been continuous;
3. The purchase price paid;
4. Size, as it relates to specific agricultural use;
5. Whether an indicated effort has been made to care sufficiently and adequately for the land in accordance with accepted commercial agricultural practices, including, without limitation, fertilizing, liming, tilling, mowing, reforesting, and other accepted agricultural practices;
6. Whether such land is under lease and, if so, the effective length, terms and conditions of the lease; and
7. Such other factors as may from time to time become applicable.
* * * * * *
(4)(a) The assessor shall reclassify the following lands as nonagricultural:
* * * * * *
3. Land that has been zoned to a nonagricultural use at the request of the owner subsequent to the enactment of this law; or
* * * * * *

*947 (c) Sale of land for a purchase price which is three or more times the agricultural assessment placed on the land shall create a presumption that such land is not used primarily for bona fide agricultural purposes. Upon a showing of special circumstances by the landowner demonstrating that the land is to be continued in bona fide agriculture, this presumption may be rebutted.
The final judgment discusses these various statutes and concludes the case is primarily governed by Section 193.461(4)(c), Florida Statutes (1972 Supp.). The court found that a sale at more than three times the value of the agricultural assessment had occurred. As a result of this statute, the court relied upon the presumption provided therein and concluded the landowners had not shown the special circumstances required under the statute to consider the property as agricultural.
The final judgment also holds that a rezoning to a nonagricultural use had occurred. As a result, Section 193.461(4)(a)3, Florida Statutes (1972 Supp.), was found applicable, but the judgment is not couched in terms of reliance upon this statute which is mandatory in nature.
The final judgment also concludes that the property was not used for "bona fide agricultural purposes" within the statutory definition of "good faith commercial agricultural use of the land." The latter finding appears to be an independent factual determination which is not based on either the sale statute or the rezoning statute.
The tension between real estate development and continued agricultural use of land for tax purposes has promoted substantial litigation in the growing geography and case law of Florida. Although presented in slightly different factual contexts, the prevailing question is whether property soon to be used in nonagricultural development may be maintained as agricultural land and so taxed until the first shovel is actually turned in nonagricultural pursuits. We start by surveying the cases on the subject.
In Straughn v. Tuck, 354 So.2d 368 (Fla. 1978), the Supreme Court considered the constitutionality of Section 193.461(3), Florida Statutes (1973). The Court concluded that the statute was constitutional and that "use is still the guide post in classifying land" for agricultural purposes under the taxing statutes. The Court concluded as follows:
Agricultural use is now and has always been the test. "Commercial agricultural use" simply adds another factor, i.e., profit or profit motive, which may be considered by the tax assessor in determining whether or not a claimed agricultural use is bona fide. It does not, as appellees suggest, limit agricultural classification to commercially profitable agricultural operations.
Shortly after the Tuck decision, the Supreme Court decided Roden v. K & K Land Management, 368 So.2d 588 (Fla. 1978). There, K & K Land Management bought approximately 350 acres of producing citrus groves for six times the agricultural assessment. Twenty-five acres of highway frontage contained in the 350 acres were developed into an amusement park. The remainder of the grove was used for continued citrus production. The issue before the trial court was whether the taxpayer had overcome the presumption on nonagricultural use established by the sale statute, Section 193.461(4)(c), Florida Statutes (1979). The trial court concluded the property should be classified agricultural and so taxed. On review, the Court again stressed that agricultural use was the crucial consideration and that profit or profit motive was not a necessity. The decision in First National Bank of Hollywood v. Markham, 342 So.2d 1016 (Fla. 4th DCA 1977), holding that commercial agriculture meant profitable agriculture was disapproved. In Fisher v. Schooley, 371 So.2d 496 (Fla. 2d DCA 1979), the Second District Court of Appeal considered a situation where property was bought at more than three times its agricultural assessment for purposes of shopping center development. Before the sale and as a condition thereof, the zoning on the property was changed from "agricultural" to "commercial." The zoning change occurred *948 in 1971 prior to the effective date of Section 193.461(4)(a)3, Florida Statutes (1972 Supp.). After the rezoning and purchase, the new owner attempted to develop the property as a shopping center. The services of a land planner were engaged and market, population and traffic studies and surveys were done. Tentative commitments from prospective tenants of the planned shopping center were solicited. Early loan commitments were secured and financial preparation was done. The owner had every intention of devoting the property to future development as a shopping center as soon as possible. While engaged in these processes, the land was actually used for the growing of vegetables. Both before and after the sale, the property was leased to the same vegetable farmer who grew crops on it. In short, the property was being used for agriculture while the paperwork was being done to build a shopping center on it. The court held the proper classification to be agricultural and concluded actual use was the determinative factor rather than future motive or expectancy. To the same effect is Department of Revenue v. Goembel, 382 So.2d 783 (Fla. 5th DCA 1980). The land in question there was bought for more than three times its agricultural assessment and in an attempt to establish an agricultural classification, the owner showed continued agricultural use as a citrus grove at a minimal profit. Once again, it was held that commercial success was not required for an agricultural classification and that use as a grove while fully engaged in paper attempts at future development did not require a nonagricultural classification.
A different line of cases is presented in Bass v. General Development Corporation, 374 So.2d 479 (Fla. 1979), and Harbor Ventures, Inc. v. Hutches, 366 So.2d 1173 (Fla. 1979). In Bass the real estate was under a cattle grazing lease and was exclusively devoted to agricultural activity. The landowner filed a subdivision plat for a portion of the land and relying upon Section 193.461(4)(a)4, Florida Statutes (1975), the property appraiser reclassified it as nonagricultural. The Supreme Court considered the case and found Section 193.461(4)(a)4, Florida Statutes (1975), to be unconstitutional in that it created an irrebuttable presumption of nonagricultural use based upon the mere recording of a subdivision plat. The Court found that the recording of a subdivision plat had no real or substantial relationship to the actual use of the land. In Bass the platting statute was the sole basis for reclassification of the property as nonagricultural and the statute was held unconstitutional. In Harbor Ventures, Inc. v. Hutches, supra, the Court declined to decide a constitutional attack on Section 193.461(4)(a)3, Florida Statutes (1973), the zoning subsection which requires reclassification as nonagricultural when land "has been zoned to a nonagricultural use at the request of the owner... ."
We now apply the above precedents in reviewing the present judgment. With all respect for the trial court, we conclude the sale statute, Section 193.461(4)(c), Florida Statutes (1972 Supp.), was improperly applied. The judgment makes it clear that although various contracts were signed on the property, no closing ever occurred and legal title never actually passed from the present owners to the various prospective purchasers who intended to develop the property. The owners, who have not yet sold the property, are the contesting taxpayers here and the sale statute applies as against a purchaser of the property. See Bass v. General Development Corporation, supra, and Roden v. K & K Land Management, Inc., supra. Appellees argue that a contract purchaser holds equitable title and that a "sufficient sale" occurred under the facts of this case to invoke the presumption under the sale statute. We disagree and hold that Section 193.461(4)(c), Florida Statutes (1972 Supp.), applies only to a completed sale of realty. The effective transfer of legal title is thus a necessity before the new owner has the burden of showing "special circumstances" warranting an agricultural classification. The practicality and necessity of this ruling is demonstrated by the facts in this case. At least four presumably binding contracts were signed by appellants *949 but each contract expired without a closing. We do not believe the Legislature intended to bar land from an agricultural classification for tax purposes upon the mere signing of a contract to sell it. The statute uses the words "sale of land for a purchase price" and we hold this language means a completed sale rather than the signing of a contract for a future sale. We believe this limited and more narrow construction of the statute is consistent with the legislative purpose. The trial court thus erred in employing the presumption established by the sale statute before a sale actually took place.
We next consider the rezoning statute, Section 193.461(4)(a)3, Florida Statutes (1972 Supp.), which the trial court also found applicable. The court concluded that the property had been rezoned from "agricultural" to "planned unit development" (PUD). This PUD classification was residential in nature. The City of Miramar clearly granted the rezoning request and did in fact rezone the property "P" on the City's zoning records. Appellants urge the rezoning was subject to various conditions including the dedication of certain land for public recreational purposes and compliance with future recommendations of city officials and all manner of future city ordinances and other uncertain future requirements. Appellants thus contend the trial court erred in concluding that the property had been rezoned because numerous steps and other conditions were necessary before the property could actually be used, that is, before buildings could actually be constructed upon it. The question of whether the property was actually rezoned was a mixed one of fact and law. The trial court determined it based upon the statute and from the conflicting evidence presented. Abundant evidence appears in the record supporting the trial court's conclusion that the property was in fact rezoned and we are not prepared to reverse this factual or legal conclusion. Affirmance of the finding of rezoning, unfortunately, does not answer the question. The statute speaks in terms of land zoned to a "nonagricultural use." The statute is not clear as to whether this means that agriculture is barred from being carried on or whether it means that agriculture and other nonagricultural pursuits may be simultaneously carried on. Hypothetically, if property is rezoned from "agricultural" to a single family residence classification and the new zoning is strictly enforced, then the agricultural use must cease. In the instant case, the City's ordinance on PUD zoning clearly does not contemplate agricultural use within the residences, professional offices and open spaces required in the PUD zone. Notwithstanding the terminology of the PUD ordinance, other documentation in the record shows that the City of Miramar herein condoned the continued agricultural use on the property in question at least pending its actual use as a residential development under the PUD zoning. Thus, although perhaps the cows should have gone, they were allowed by the City to stay for at least the two years in question.
This leads us to a constitutional question regarding the rezoning statute. Although not raised before the trial court, Bass v. General Development Corporation, supra, is urged by appellants in support of an argument that the rezoning statute is unconstitutional for the same reasons as the platting statute. By analogy, appellants argue that if platting has nothing to do with actual use then zoning should be similarly considered and the zoning statute is equally unconstitutional. Obviously, if "nonagricultural" means that agriculture is actually barred and may not be carried on, then the statute appears reasonable. On the other hand, if a change to "nonagricultural" zoning does not interfere with actual existing agricultural pursuits on the land, then the reasoning of Bass v. General Development Corporation, supra, would appear applicable. Since these issues were not presented or tried before the Circuit Court, we decline to answer the constitutional question which appellants now urge. We conclude that the rezoning here did not have any effect on the actual use of the property in agriculture and that the change in zoning from one designation where agriculture *950 was permitted to another designation where agriculture was also permitted did not require the reclassification of the property as nonagricultural as a matter of law pursuant to the statutory rezoning provisions.
The third finding of the trial court was that the property in question was simply not used for bona fide agricultural purposes because it was not in good faith commercial agricultural use. We conclude that this finding cannot stand in view of the trial court's erroneous reliance upon both the sale statute and the rezoning statute. Since the trial court improperly employed these two statutory provisions, the further factual conclusion as to lack of good faith commercial agricultural use must fall. We conclude that the property in question was actually being used at all times in question in agriculture. Although the property had been rezoned, the rezoning did not disturb its agricultural use. Although contracts had been signed for the sale of the property, it had not been actually sold. Under the statutes and the precedents construing them, actual use remains the test and we conclude that the owners herein were entitled to the agricultural classification for the years in question. We, therefore, reverse the judgment herein and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
DOWNEY and GLICKSTEIN, JJ., concur.